# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>PAUL C. ADAIR,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Civil Action No. 04-1469(EGS)</td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>HILDA SOLIS, Secretary of the</td><td>)</td><td></td></tr>
<tr><td>Department of Labor,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.[1]</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## MEMORANDUM OPINION

Plaintiff Paul Adair, pro se, was employed as a Trial Attorney by the United States Department of Labor, Office of the Solicitor, Division of Plan Benefits Security from 1995 to 2003. Plaintiff claims that defendant unlawfully discriminated against him on the basis of his race (African-American) and disability (depression) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et seq.* Plaintiff also seeks review of the decision of the Merit System Protection Board ("MSPB") affirming his termination by defendant for (i) failure to complete certain assignments, (ii) insubordination, and (iii) making statements to supervisors

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Hilda Solis, in her official capacity as Secretary of the Department of Labor, is automatically substituted as the named defendant.

and co-workers that resulted in anxiety and disruption in the workplace. Plaintiff argues that the MSPB's decision is unsupported by substantial evidence, does not promote the efficiency of the federal service, and was rendered in violation of his due process rights. Defendant has moved for summary judgment on all of plaintiff's claims, and plaintiff has filed cross-motions for summary judgment as to his non-discrimination claims. Upon consideration of the motions, the responses and replies thereto, the applicable law, the entire record, and for the reasons set forth below the Court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motions for partial summary judgment.

## I.    BACKGROUND

Plaintiff, an African-American male, was employed as a trial attorney for the Plan Benefits Security Division ("PBSD") of the Office of the Solicitor of Labor from April 1995 through March 29, 2003. Def.'s Statement of Material Facts ("Def.'s SMF") ¶¶ 1-2. His principal responsibility at PBSD was conducting litigation under the Employees Retirement Income Security Act ("ERISA") on behalf of the Secretary of Labor. Def.'s SMF ¶ 2. During his tenure at PBSD, one of the cases that Mr. Adair was assigned to was known as the "Employers Mutual" case. Def.'s SMF ¶ 3. Senior trial attorney William Scott was the supervising attorney assigned to the Employers Mutual case. Def.'s SMF ¶ 3.

2

In 2002, certain issues began to arise between Mr. Adair and Mr. Scott regarding Mr. Adair's work on the Employers Mutual case. Specifically, on April 24, 2002, Mr. Scott sent Mr. Adair a detailed email directing plaintiff to make certain changes to a contempt motion that was to be filed in the case. *See* AR [Docket Entry 7-10 at 20], Email from Scott to Adair dated April 24, 2002; AR [Docket Entry 7-8 at 5-12], Declaration of G. William Scott dated July 3, 2003 ("2003 Scott Decl.") ¶ 4. By email dated April 29, 2002, Mr. Adair responded to Mr. Scott stating that he thought the motion was "fine." AR [Docket Entry 7-8 at 13-14], Ex. A to 2003 Scott Decl., Email from Adair to Scott dated April 29, 2002. Mr. Scott responded by renewing his request for Mr. Adair to make the suggested changes, explaining that without revision it was unclear what actions constituted contempt. AR [Docket Entry 7-8 at 13-14], Ex. A to 2003 Scott Decl., Email from Scott to Adair dated May 1, 2002; 2003 Scott Decl. ¶ 6. Mr. Scott also indicated that the motion should propose a remedy. By email dated May 2, 2002, Mr. Adair responded by stating that "[t]he proof is obvious" and "I would live [sic] the relief to the court." AR [Docket Entry 7-8 at 13-14], Ex. A to 2003 Scott Decl., Email from Adair to Scott dated May 2, 2002. Mr. Scott then, once again, explained his concerns with plaintiff's approach, and asked Mr. Adair to "finalize the motion papers today and give a copy to me[.]" AR [Docket Entry

7-8 at 13-14], Ex. A to 2003 Scott Decl., Email from Scott to Adair dated May 2, 2002.  Mr. Adair failed to revise the motion on May 2, 2002 as requested.  2003 Scott Decl. ¶ 8.[2]

In June 2002, Mr. Adair submitted a request for extended Annual Leave to Karen Handorf, Deputy Associate Solicitor for PBSD.  *See* AR Tab 4gg(2), Ex. A to Declaration of Karen Handorf, Letter from Handorf to Adair dated July 5, 2002 ("Handorf Letter").  Ms. Handorf denied Mr. Adair's leave request, citing Mr. Adair's heavy workload and unfinished assignments for the Employers Mutual case.  *See* Handorf Letter ("On June 17, 2002, you requested annual leave and this leave was denied because of your heavy workload.  Specifically, for the Employers' Mutual Case, you had not sent the contempt letter, had not revised and filed the default motions and had not submitted a discovery plan,

---

[2]    It is plaintiff's position that he "gave Scott a final draft" of the contempt motion.  *See* Pl.'s Response to Def.'s SMF ¶ 5.  Plaintiff does not, however, address whether he made the suggestions requested by Mr. Scott.  Instead, plaintiff states: "On September 30, 2002, Scott sent an email to Perlman that states in relevant part: 'Also attached is [Plaintiff's] draft of the contempt motion which he prepared . . . It is OK.'"  Pl.'s Response to Def.'s SMF ¶ 5 (quoting AR Tab 13, Ex. W, p. 1). Upon review of the exhibit cited by plaintiff, however, this email states: "Also attached is [plaintiff's] draft of the contempt motion which he prepared over his strenuous objection. It is OK, except that is [sic] does not state what remedy we want (and supporting authority) because [plaintiff] thinks it is inappropriate."  AR Tab 13, Ex. W, p. 1.  As plaintiff does not dispute the accuracy of this email – and, indeed, relies upon it – plaintiff has not created a genuine issue of material fact regarding whether he made the changes to the contempt motion that Mr. Scott requested.

as requested by your supervisor on that case."). Mr. Adair then requested extended medical leave and was told that the request would be considered after medical documentation was provided. *See* Handorf Letter. On June 28, 2002, Mr. Adair left a prescription paper from his doctor on Ms. Handorf's chair, which states: "Paul Adair was seen and a treatment plan is provided for therapy." *See* AR [Docket Entry 7-15 at 8], Prescription from Dr. William D. Lawson, M.D., Department of Psychiatry, Howard University Hospital; *see also* Handorf Letter. Ms. Handorf then informed Mr. Adair that the prescription paper was "inadequate to justify extended sick leave because it does not state that you will be unable to come to work because of medical treatment nor does it state that you are incapable of performing the duties of your job." Handorf Letter. Ms. Handorf further advised Mr. Adair that "if your doctor is unwilling to provide a statement that you are not able to perform the duties of your job, we will consider a letter detailing the symptoms of your condition which we will then evaluate to determine whether to grant you extended sick leave." Handorf Letter. Mr. Adair failed to produce any additional documentation from any health care professionals and returned to work. *See* AR Tab 4gg at 1, Declaration of Karen Handorf ("Handorf Decl.") ¶ 3.

On July 17, 2002, Mr. Scott sent an email to Mr. Adair (the "July 17th Email"), which instructed him to complete five assignments related to the Employers Mutual case with a deadline of July 23, 2002. *See* AR Tab 4cc2, Ex. A to Declaration of G. William Scott dated Nov. 13, 2002 ("2002 Scott Decl."), Email from Scott to Adair dated July 17, 2002. On July 23, 2002, Mr. Scott sent Mr. Adair an email, which stated: "Paul: I asked you to see me before you left today, but I see you have gone without doing so. Please tell me whether you have completed these tasks; today is the due date. There is a lot to do in this case." AR [Docket Entry 7-15 at 11], Email from Scott to Adair dated July 23, 2002. After receiving no response, Mr. Scott sent another follow-up email on July 26, 2002, which stated: "Paul: Please tell me whether you have done the assignments listed below. I have not reassigned these tasks. As you know, Peter, Ben and I are doing some of the work that was previously assigned to you, but we can't do it all at this point given our other responsibilities. No one has informed me that you are on sick leave or annual leave. If you are simply refusing to do these tasks, please inform me. If you don't respond to this e-mail, I will have no choice but to assume that you refuse to do this work. Please communicate with me!!" AR [Docket Entry 7-15 at 12], Email from Scott to Adair dated July 26, 2002. By emails dated August 1, 2002, August 2, 2002, and August 7, 2002, Mr.

Scott extended the due date for the assignments contained in the July 17th Email to August 19, 2010, and indicated that Mr. Adair no longer needed to complete two of the five assignments. *See* AR Tab 4cc2, Emails from Scott to Adair dated Aug. 1, 2002, Aug. 2, 2002, and Aug. 7, 2002.

On August 8, 2002, Mr. Adair met with his supervisor Leslie Perlman. They discussed, among other things, the assignments that Mr. Scott had given Mr. Adair on July 17, 2002. On August 9, 2002, Ms. Perlman sent Mr. Adair an email with the assignments contained in the July 17th Email, and stated: "Paul: As I told you yesterday, I am sending you the following assignments for the [Employers Mutual] case even though you told me yesterday that you would not do the assignments and would accept your punishment (short of a trip to the employment office). I urge you to reconsider your position. You must complete the assignments below on the schedule Bill proposed which has a [revised] deadline of August 19." AR Tab 4cc3, Ex. B to 2002 Scott Decl., Email from Perlman to Adair dated Aug. 9, 2002. By email dated August 28, 2002, Mr. Scott sent an email to Mr. Adair asking if had performed any of the tasks assigned on July 17, 2002. AR Tab 4cc3, Ex. B to 2002 Scott Decl., Email from Scott to Adair dated Aug. 28, 2002.[3]

---

[3] There is a factual dispute regarding whether Mr. Adair completed the assignments. While Mr. Adair contends that he either completed or attempted to complete the assignments, he

On October 17, 2002, Elizabeth Hopkins, a supervisor at
PBSD, asked Mr. Adair to attend a mid-year performance review
(hereinafter, the "October 17th Meeting").  AR Tab 4ee,
Declaration of Elizabeth Hopkins ("Hopkins Decl.").  In
attendance at the October 17th Meeting were plaintiff, Ms.
Hopkins, Mr. Scott, Ms. Perlman, and another supervisor, Risa
Sandler.  Def.'s SMF ¶ 11.  During the meeting, after Ms. Perlman
and Ms. Hopkins praised Mr. Adair for his performance on the
cases that they were supervising, Mr. Scott raised his
dissatisfaction with Mr. Adair's performance on the Employers
Mutual case.  AR Tab 4dd, Declaration of Risa Sandler ("Sandler
Decl.") ¶¶ 4, 5.  While the details of the meeting are disputed,
it is undisputed that at some point during the meeting Mr. Adair
stated that he had been disrespected by Mr. Scott, and that he
"would rather see everyone dead and the whole world destroyed"
than suffer disrespect.  *See* AR Tab 4aa, Declaration of Paul
Adair dated Dec. 6, 2002 ("2002 Adair Decl.") ¶ 32 ("As the

---

provides no evidence in support of this contention.  The agency,
by contrast, takes the position that the assignments remained
incomplete as of the October 17th Meeting.  *See* 2002 Scott Decl.
¶ 8 (explaining that as of the October 17th Meeting plaintiff
"still ha[d] not done the work or offered [him] a valid excuse
for his failure and refusal to do the work").  This factual
dispute was closely analyzed by the MSPB.  *See* AR [Docket Entry
7-1 at 4-23, 7-2 at 1-25], MSPB Decision at 17-24 (weighing the
evidence and concluding that the agency established that
plaintiff failed to complete 3 out of the 5 tasks as directed by
Mr. Scott within the deadlines provided).  This factual dispute,
however, is immaterial to the Court's resolution of this case.

8

meeting drew to a close I said I felt strongly about dignity and respect and that my 'philosophy' was that I 'would rather see everyone dead and the whole world destroyed' than suffer indignity and disrespect.  I then said 'that's it.'"); *see also* AR Tab 4ff, Declaration of Leslie Perlman ("Perlman Decl.") ¶ 6; Sandler Decl. ¶ 8; Hopkins Decl. ¶ 2; 2002 Scott Decl. ¶ 13.  Mr. Adair also stated that he had been "feeling violent," and had sought counseling as a result.  Sandler Decl. ¶ 8; Perlman Decl. ¶ 10; Hopkins Decl. ¶ 2; *see also* 2002 Adair Decl. ¶ 30.[4]  When asked if he could continue to work with Mr. Scott, Mr. Adair likened it to finding a peaceful solution in the Middle East. Sandler Decl. ¶ 10; Hopkins Decl. ¶ 2; 2002 Adair Decl. ¶ 31.

After the meeting, each of plaintiff's supervisors reported feeling shocked and upset.  *See* Sandler Decl. ¶¶ 12-14 ("I was very alarmed by Mr. Adair's demeanor and his comments.  I was concerned that he might pose a danger to Mr. Scott or to others.

---

[4]    While plaintiff later explained that he had been feeling violent towards himself, *see* 2002 Adair Decl. ¶ 30 (explaining that during the October 17th Meeting he did not indicate "toward whom [he] felt violent because [he] did not wish to disclose that [he] was at one point suicidal"), the sworn declarations of his supervisors at the meeting indicate that they thought plaintiff's feelings of violence were directed at Mr. Scott.  Indeed, during the October 17th Meeting Mr. Scott asked plaintiff if he was threatening him, to which plaintiff responded "No." *See* 2002 Adair Decl. ¶ 30 (acknowledging that his ambiguous statement that he had "taken time off because [he] had felt violent . . . caused Scott to ask 'is that a threat?'"; explaining that he "quickly dispelled that idea by stating that [he] was talking about how [he] felt before [his] time off").

. . . I was particularly alarmed by Mr. Adair's comments mentioning killing and death.  Although it appeared that his anger was directed primarily towards Mr. Scott, his comments mentioning killing and death were directed towards people in general. . . . Based on Mr. Adair's conduct and remarks at the meeting, I am concerned that anyone in this office (or, for that matter, anyone in this building) could be a target of Mr. Adair's anger."); Perlman Decl. ¶ 11 ("I was and continue to be seriously concerned about the safety of our employees where a coworker has said that he would rather see everyone dead than be disrespected. That statement upset me and made me feel that Mr. Adair might present a serious threat to Mr. Scott and others in this office.").[5]  Indeed, each of the supervisors sent an email to Timothy Hauser, Associate Solicitor at PBSD, expressing their concerns regarding plaintiff's behavior.[6]  Mr. Scott also

---

[5]    *See also* Hopkins Decl. ¶ 4 ("I was very upset and depressed by this encounter and literally had a splitting headache all afternoon. . . . Paul's angry comments and violent imagery were alarming.  I am new to this office and have come close to thinking I made a mistake coming here, in large part because of the stress of this situation."); 2002 Scott Decl. ¶¶ 21-22 ("After the October 17 meeting, I told Mr. Hauser that, based on Mr. Adair's statements and behavior at the meeting, I did not feel comfortable or safe supervising Mr. Adair in any direct or indirect manner in the future.  I was unable to concentrate on my work for the remainder of Thursday October 17 due to Mr. Adair's statements and conduct at the meeting.").

[6]    *See* AR Tab 4jj, Email from Perlman to Hauser dated Oct. 17, 2002 ("I am very concerned about [plaintiff's] statements and believe that they must be taken seriously. [Mr. Scott] now agrees that it would be fruitless for him to continue to try to work

contacted security at the Department of Labor.  *See* AR Tab 4cc4,

Ex. C. to 2002 Scott Decl., Email from Scott to Robert Rouse

dated Oct. 18, 2002 (discussing the October 17th Meeting, and

concluding: "Mr. Adair's statements made me uncomfortable and

afraid of what he might do, and I believe he intended to make me

feel that way.  Please do what you can to preserve the safety of

the DOL employees around Mr. Adair.").  On October 18, 2002 –

after interviewing Mr. Scott, Ms. Perlman, Ms. Hopkins, and Ms.

Sandler – Mr. Hauser contacted Mr. Adair at his home,[7] and

informed Mr. Adair that he was being placed on administrative

leave and was barred from the PBSD building.  *See* AR Tab 4kk,

Email from Hauser to Adair dated Oct. 18, 2002 ("I am writing to

confirm our conversation.  As I indicated, you are on

administrative leave and will not be allowed into the building.

I am concerned about the statements you made at the October 17

---

with [plaintiff]."); AR Tab 4ii, Email from Sandler to Hauser
dated Oct. 17, 2002 ("All in all, [plaintiff's] tone and attitude
were very threatening.  There is a possibility that he was
putting on an act, but I don't think so, and I don't think we
should take any chances.  I recommend consulting with the
appropriate human resources people concerning the possibility of
removing [plaintiff] from the premises immediately and revoking
his building pass on the ground that he is dangerous."); AR Tab
4hh, Email from Scott to Hauser dated Oct. 17, 2002 ("I feel very
uncomfortable even if I don't work with [plaintiff] again.");
Email from Hopkins to Hauser dated October 18, 2002 (describing
plaintiff's comments at the October 17th Meeting).

     [7]    Plaintiff worked at home on Friday, October 18, 2002,
"pursuant to his regular flextime schedule."  Pl.'s Supp. Mot.
for Partial Summ. J. at 13.

meeting, and about the fear and disruption caused by those statements.").

Soon thereafter, on November 14, 2002, Ms. Perlman sent Mr. Adair a notice of a proposal to remove him from his position as a trial attorney at PBSD (the "Notice of Proposed Removal"). *See* AR Tab 4bb, Notice of Proposed Removal. This seven-page notice informed Mr. Adair, among other things, that his proposed removal was based on the following charges: (1) "[m]aking statements to supervisors and co-workers that resulted in anxiety and disruption in the workplace"; (2) "[f]ailure to follow instructions"; and (3) "[i]nsubordination." *See generally* Notice of Proposed Removal; Def.'s SMF ¶ 19. The notice also contained detailed specifications setting forth the specific conduct that each charge was based upon. As is relevant to this case, the anxiety and disruption charge is based upon the statements that plaintiff made during the October 17th Meeting, including that he "had been feeling violent" and "would rather see everyone dead and the whole world destroyed" than be disrespected; the failure to follow instructions charge is based upon plaintiff's alleged failure to revise the contempt motion as requested and to complete the assignments contained in the July 17th Email; and the insubordination charge is based upon plaintiff's alleged statement to Ms. Perlman that he refused to work on the Employers Mutual case during their meeting on August 9, 2010, as well as a

similar statement that he allegedly made during the October 17th

Meeting.[8]  *See* Notice of Proposed Removal.  Mr. Adair submitted a

32-page response to the agency's notice, in which he argued,

among other things, that "the Notice fails to provide a just

basis for the proposed action, it does not promote efficient

operation of the Federal Service, and is disproportional to the

---

[8]      It is Mr. Adair's position that he "never flatly
refused to do any work" on the Employers Mutual case.  AR Tab 4d
at 6 n.1, Plaintiff's Response to Notice of Proposed Removal.  He
avers that: "He asked to be removed from the [Employers Mutual]
case, but he only refused to do those assignments he was
incapable of doing for lack of information or because he was
being asked to do an assignment that he considered to be a
violation of the rules of practice or professional
responsibility.  As Perlman's August 9th e-mail notes, Adair also
added a significant caveat.  Adair stated his refusal would
succumb to any risk of employment. . . . Thus, the presumption
that he would not have done any future assignment is inaccurate."
AR Tab 4d at 6 n.1.  Plaintiff also denies stating that he
refused to do any future work on the Employers Mutual case at the
October 17th Meeting; it is his position that during the meeting
he simply "reiterated [his] problems working on the case and also
wondered how useful [he] would be [on the case]."  2002 Adair
Decl. ¶ 32.  The sworn declarations of his supervisors in
attendance at the meeting, however, dispute Mr. Adair's account.
*See, e.g.*, Perlman Decl. ¶ 6 ("I told Mr. Adair that he had not
been taken off the Employers Mutual case. . . . Mr. Adair became
incensed and said that he was not going to work on the case.  Mr.
Adair angrily told Mr. Scott that he was incompetent and that he
wasn't going to be taken down with Mr. Scott."); Sandler Decl.
¶ 6 ("Mr. Adair stated that he would not work on the case because
Mr. Scott is disrespectful.  He said that Mr. Scott called him
names, wrote disrespectful notes, sent him disrespectful emails
and made disrespectful comments in front of others.  He said that
Mr. Scott is incompetent and he would not work for someone who is
incompetent.  He said something like 'I don't want to go down
with him.'").  Given the issues before the Court, and the
procedural posture of the case, the Court finds this factual
dispute immaterial to the Court's resolution of the case.

reasons alleged[.]"  AR Tab 4d at 1.[9]

On March 26, 2003, Mr. Hauser issued a memorandum upholding the Notice of Proposed Removal (the "Agency Decision").  Def.'s SMF ¶ 20; *see* AR Tab 4a, Agency Decision at 1 ("This memorandum constitutes my decision on the proposal to remove you from your position for making statements that resulted in anxiety and disruption in the workplace, insubordination, and failure to follow supervisors' instructions.").  In his decision, Mr. Hauser found that the reasons set forth in the Notice of Proposed Removal were supported by a preponderance of the evidence, and that the severity of plaintiff's conduct warranted removal.  *See* Agency Decision at 1; *see also* Agency Decision at 6 ("After consideration of all of the evidence, I conclude that it is appropriate to terminate your employment as proposed, particularly in light of the seriousness of the offenses and the sensitivity of your position. . . . PBSD cannot effectively discharge its responsibilities if employees refuse to follow the directions of their supervisors, and supervisors cannot do their

---

[9]     Plaintiff declined Mr. Hauser's request to meet with him to discuss his written response or to provide an oral reply. *See* Agency Decision at 7 ("You have . . . withdrawn your request to give an oral reply, and have declined my repeated requests that you provide such a reply . . . .  Although you certainly have no obligation to meet with me personally to discuss your case, your decision means that I have been unable to question you about your responses to the Notice of Proposed Action or about any circumstances that you believe may be mitigating.").

jobs if they have to worry about the potential for unwarranted, provocative, and possibly dangerous responses when they issue proper directions to an employee."). Accordingly, plaintiff was removed from federal service effective March 29, 2003. Def.'s SMF ¶ 21.

Plaintiff then appealed the Agency Decision to the MSPB on April 14, 2003, and the matter was referred to Administrative Judge Sherry Armstrong (the "ALJ"). Def.'s SMF ¶ 22. On August 11, 2003, Judge Armstrong issued a 48-page opinion (the "MSPB Decision") upholding the Agency Decision and concluding that the agency-imposed penalty of termination "supports the efficiency of the service and was reasonable." AR [Docket Entry 7-1 at 4-23, 7-2 at 1-25], MSPB Decision at 26; Def.'s SMF ¶ 24. Specifically, with regard to the agency's charges, the ALJ found that: (1) "[t]he agency established its charge of making statements to supervisors and co-workers that resulted in anxiety and disruption in the workplace by preponderant evidence"; (2) "[t]he agency established its charge of failure to follow instructions by preponderant evidence"; and (3) "[t]he agency established its charge of insubordination by preponderant evidence." MSPB Decision at 8-31. The ALJ also found that: (i) plaintiff failed to establish an entitlement to sick leave or leave under the FMLA due to his refusal to submit documentation to the agency in support of his request; (ii) plaintiff failed to

establish race or gender discrimination as the agency had proffered a legitimate, non-discriminatory reason for plaintiff's termination and there were no similarly-situated individuals that were treated differently; (iii) plaintiff failed to establish disability discrimination as he did not present any evidence to establish that he had a physical or mental impairment that substantially limited one or more major life activities; and (iv) plaintiff failed to establish a harmful procedural error. MSPB Decision at 3-8, 31-43.

Plaintiff subsequently appealed Judge Armstrong's opinion to the full MSPB. Def.'s SMF ¶ 25. This appeal was denied on May 13, 2004. *See Adair v. Dep't of Labor*, 97 M.S.P.R. 605 (2004) (concluding that the "administrative judge made no error in law or regulation that affects the outcome," and holding that "[t]he initial decision of the administrative judge is final"). Plaintiff then sought review of the MSPB Decision to the Equal Employment Opportunity Commission (the "EEOC"). Def.'s SMF ¶ 26. The EEOC also denied plaintiff's appeal, finding that "the MSPB's decision constitutes a correct interpretation of the laws, rules, regulations, and policies governing this matter and is supported by the evidence in the record as a whole." Def.'s SMF ¶ 26.

Accordingly, on August 30, 2004, plaintiff filed suit in this Court alleging (i) race discrimination, (ii) sex discrimination, (iii) interference with and denial of family and

medical leave, (iv) disability discrimination, and (v) violations of due process. He also sought review of the MSPB Decision. Thereafter, plaintiff voluntarily dismissed his claims for sex discrimination and interference with and denial of family and medical leave. *See* Pl.'s Opp'n Br. at 3 n.2 ("Plaintiff is no longer pursuing a claim of gender discrimination."); Order Dated March 16, 2006 ("[A]t plaintiff's request, it is FURTHER ORDERED that plaintiff's claim under the Family and Medical Leave Act is DISMISSED."). Pending before the Court, therefore, are plaintiff's remaining discrimination claims, his allegation of due process violations, and his petition for review of the MSPB Decision.[10] Defendant has moved for summary judgment on all

---

[10] It is unclear to the Court whether plaintiff now seeks to assert a retaliation claim. While plaintiff never pled a retaliation claim, *see generally* Compl., and indeed specifically stated during the course of this litigation that he was not asserting a retaliation claim, *see* Pl.'s Mot. for Partial Summ. J. at 26 n.9 ("Plaintiff's purpose is not to perfect a retaliation claim, but rather to show that he would have had a colorable claim . . . ."), plaintiff now states that his "[c]omplaint encompasses two retaliation claims that would be pled specifically but for Defendant's withholding of evidence." Pl.'s Mot. for Partial Summ. J. at 44. Because plaintiff never sought leave of the Court to assert a retaliation claim during the more than five years of active litigation in this case, the Court declines to entertain such a claim now. Accordingly, to the extent that plaintiff seeks leave to assert a retaliation claim in this case, his request is **DENIED**. *See also* Def.'s Reply Br. at 13 n.17 (setting forth compelling reasons that "[s]hould the Court entertain [plaintiff's] purported retaliation claim, Defendant is entitled to judgment as a matter of law"). The Court will also note that plaintiff attempted to assert a

claims, and plaintiff has filed a cross-motion as to his non-discrimination claims.  These motions are now ripe for determination by the Court.

## II.  STANDARD OF REVIEW

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The party seeking summary judgment bears the initial burden of demonstrating an absence of genuine issues of material fact. *Celotex*, 477 U.S. at 322.  In determining whether a genuine issue of material facts exists, the Court must view all facts in the

---

retaliation claim, for the first time, in his closing submissions to the MSPB.  The MSPB also declined to allow plaintiff to assert a retaliation claim, *see* MSPB Decision at 41 ("[I]t is my determination that the appellant's allegation of retaliation was untimely raised and it should not be considered further."), but found that "even if the appellant's untimely allegation regarding retaliation was permitted, it would still fail." *Id.*

light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986); *Keyes v. Dist. of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *St. Michael's Med. Ctr. v. Sebelius*, 648 F. Supp. 2d 18, 25 (D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. Moreover, "although summary judgment 'must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial.'" *Bolden v. Winter*, 602 F. Supp. 2d 130, 136 (D.D.C. 2009) (quoting *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001)).

Summary judgment will be granted, therefore, if the plaintiff fails to submit evidence that creates a genuine factual dispute or entitlement to judgment as a matter of law.  *Wada v. Tomlinson*, 517 F. Supp. 2d 148, 181 (D.D.C. 2007); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases" (citing cases)).

## III. ANALYSIS

As noted above, defendant has moved for summary judgment as to plaintiff's race and disability discrimination claims on the grounds that it had legitimate, non-discriminatory reasons for Mr. Adair's claims for removal, and that Mr. Adair failed to produce evidence that a discriminatory reason motivated defendant's decision or that defendant's proffered reasons are a pretext for discrimination.  Defendant also seeks summary judgment as to plaintiff's alleged "due process violations," and argues that the MSPB Decision upholding plaintiff's removal was not arbitrary, capricious, or otherwise in derogation of the law and therefore should be upheld.  Plaintiff filed a cross-motion for partial summary judgment as to his non-discrimination claims. The Court will begin by addressing defendant's motion for summary judgment as to plaintiff's discrimination claims.

A.    **Plaintiff's Discrimination Claims**

1.    **Race Discrimination**

i. **Legal Framework**

Discrimination claims under Title VII have traditionally been analyzed under the *McDonnell Douglas* burden shifting framework.  The D.C. Circuit recently held, however, that when considering a motion for summary judgment in an employment discrimination case, a district court need not consider whether a plaintiff has actually satisfied the elements of a prima facie case if the defendant has offered a legitimate, non-discriminatory reason for its actions.  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  *Id.*  In other words, a court must determine whether "all the evidence, taken together, [is] insufficient to support a reasonable inference of discrimination."  *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (citing *Brady*, 520 F.3d at 494-95); *see also Holcomb v. Powell*, 433 F.3d 889, 896-97 (D.C. Cir. 2006) ("'[T]he plaintiff must show that a reasonable jury could conclude from all of the

evidence that the adverse employment decision was made for a discriminatory reason.'" (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003))). "[A]ll of the evidence," in turn, means "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb*, 433 F.3d at 897; *see also Washington v. Chao*, 577 F. Supp. 2d 27, 39 (D.D.C. 2008) ("[I]n all instances where a defendant has asserted a legitimate, non-discriminatory reason for its conduct, the Court shall evaluate all of the evidence in the record, including that which would be used to establish a prima facie case (but not for the purpose of evaluating whether a prima facie case has been established), to address the ultimate question of discrimination *vel non*.").

"A plaintiff may show discrimination either directly or indirectly." *Evans v. Holder*, 618 F. Supp. 2d 1, 8 (D.D.C. 2009). Evidence is direct if it shows that a "'discriminatory reason more likely motivated the employer.'" *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)). Evidence is indirect if it shows that "'the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *George*, 407 F.3d at 413).

There are at least two ways to demonstrate that a nondiscriminatory explanation is false. First, a plaintiff may show that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*, 520 F.3d at 495. Second, a plaintiff may show that a similarly situated employee outside plaintiff's protected class was treated more favorably. *Id.*

### ii. Analysis

In this case, defendant has proffered a legitimate, non-discriminatory reason for plaintiff's termination. Specifically, defendant asserts that "[p]laintiff's own conduct is the legitimate, non-discriminatory reason for Plaintiff's removal from federal service." Def.'s Mot. for Summ. J. at 9. Citing the agency's determination that plaintiff had (1) made statements to supervisors and co-workers that resulted in anxiety and disruption in the workplace; (2) failed to complete certain assignments; and (3) acted insubordinately, defendant argues that "[e]ach of these [reasons] alone is a legitimate, non-discriminatory reason for Plaintiff's removal that is not pretextual and entitles Defendant to judgment as a matter of law[.]" Def.'s Mot. for Summ. J. at 9-10. The issue before the Court, therefore, is whether plaintiff has produced sufficient evidence for a reasonable jury to find that defendant's asserted non-discriminatory reasons were not the actual reasons for the

adverse employment action, and that the employer's actions were discriminatory.

For the reasons discussed below, the Court finds that plaintiff has failed to meet this burden. Although plaintiff purports to provide the Court with both direct and indirect evidence of defendant's alleged discriminatory intent and animus, plaintiff's "evidence" is provided in the form of either conclusory allegations or mischaracterizations of the record. Because "[s]elf-serving testimony does not create genuine issues of material fact," *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007), the Court finds that defendant is entitled to summary judgment on plaintiff's race discrimination claim.

### a. Plaintiff's "Direct Evidence"

As "direct evidence" of defendant's alleged discrimination, plaintiff argues that he "was treated differently because of his race on the Employers Mutual case than two white male attorneys." Pl.'s Opp'n Br. at 4 (explaining that "'[a]n employer's policy amounts to disparate treatment if it treats [blacks and whites] differently on its face'" (quoting *Frank v. United Airlines, Inc.*, 216 F.3d 845, 853 (9th Cir. 2000)) (alternations in plaintiff's brief)). Specifically, plaintiff contends that "[i]n July 2002, supervisor William Scott gave Plaintiff and two similarly white male attorneys, Benjamin Apt and Peter Dolan, the

same exact assignments[,]" however, "Scott treated Plaintiff differently in the time given to complete the tasks, in the amount of information and other support provided, and ultimately in the investigation of the work performed on the tasks."  Pl.'s Opp'n Br. at 4-5.  As a result, plaintiff argues that "[d]efendant blatantly used race to determine how much time to allot to the attorneys to complete the Employers Mutual tasks." Pl.'s Opp'n Br. at 5.  The Court finds that plaintiff's conclusory assertions are unsupported by the record.

While it is undoubtedly true that Mr. Scott gave Mr. Apt and Mr. Dolan the same assignments that he had previously assigned to plaintiff with different deadlines and conditions, what plaintiff fails to acknowledge is that Mr. Scott assigned the tasks to Mr. Apt and Mr. Dolan after plaintiff failed to complete the assignments within the time requested.  Indeed, by email dated July 17, 2002, Mr. Scott gave Mr. Adair several assignments on the Employers Mutual case to be completed by July 23, 2002.  *See* AR Tab 4cc2.  After plaintiff failed to notify Mr. Scott regarding the status of the assignments, Mr. Scott sent plaintiff the following email on July 26, 2002:

> Paul: Please tell me whether you have done the
> assignments listed below.  I have not reassigned
> these tasks.  As you know, Peter [Dolan], Ben [Apt]
> and I are doing some of the work that was
> previously assigned to you, but we can't do it all
> at this point given our other responsibilities.  No
> one has informed me that you are on sick leave or
> annual leave.  If you are simply refusing to do

25

> these tasks, please inform me. If you don't
> respond to this e-mail, I will have no choice but
> to assume that you refuse to do this work. Please
> communicate with me!!

AR [Docket Entry 7-15 at 12]. It was not until July 29, 2002 -
after plaintiff failed to respond to Mr. Scott's July 26th email
- that Mr. Scott asked Mr. Apt and Mr. Dolan to work on the
assignments that he had originally given to plaintiff. *See* Ex. A
to Pl.'s Mot. for Partial Summ. J., Email from Scott to Dolan and
Apt dated July 29, 2002 ("This is modified version of an
assignment to [plaintiff]. Peter: please do 1 and 4. Ben:
please do 2 and 3.").[11]

Given the circumstances under which Mr. Scott gave the
assignments to Mr. Dolan and Mr. Apt, the Court finds that no
reasonable jury could find that Mr. Scott "used race to determine
how much time to allot to the attorneys to complete the Employers
Mutual tasks." Pl.'s Opp'n Br. at 5. Nor is the Court
persuaded, based on the evidence before the Court, that any
reasonable jury could find that Mr. Adair's race was the reason
that Mr. Scott assigned different case responsibilities to
plaintiff than he assigned to Mr. Apt and Mr. Dolan. *See, e.g.*,
Pl.'s Opp'n Br. at 7-8 (arguing that from July-October 2002 he
was deprived of "the desired assignments of depositions, meetings

---

[11]     While the substance of the assignments was the same,
Mr. Scott did not assign a specific deadline in his July 29, 2002
email to Mr. Dolan and Mr. Apt. *Compare* AR Tab 4cc2 *with* Ex. A
to Pl.'s Mot. for Partial Summ. J.

that required travel, [and] court appearances on Employers

Mutual" because Mr. Scott "segregated the attorneys by race . . .

[thereby] depriv[ing] him of the privileges and opportunities

enjoyed by the white attorneys").[12]  Plaintiff, therefore, has

failed to provide the Court with "direct evidence" of race

discrimination.  *Cf. Hawkins v. Holder*, 597 F. Supp. 2d 4, 17 n.7

(D.D.C. 2009) ("[Plaintiff] asserts in her Opposition that [i]n

this case, [she] has direct evidence of discrimination.

[Plaintiff], however, is wrong as a legal matter.  Direct

evidence 'is evidence that, if believed by the fact finder,

proves the particular fact in question *without any need for*

*inference*.'" (internal citations omitted) (quoting *Brown v.*

*Small*, 437 F. Supp. 2d 125, 130 n.7 (D.D.C. 2006))).  Accordingly,

the Court will address plaintiff's indirect evidence of

---

[12]    Moreover, to the extent that Mr. Adair is attempting to
argue that he was "similarly situated" to Mr. Apt and Mr. Dolan,
this argument must fail.  "To show that another individual is
similarly situated, Plaintiff must 'demonstrate that all of the
relevant aspects of their employment situation are nearly
identical.'"  *Smith v. Jackson*, 539 F. Supp. 2d 116, 135 (D.D.C.
2008).  Therefore, when, as here, an employer states that it took
an adverse employment action due to the plaintiff's misconduct,
the plaintiff's comparator must have been charged with a
comparable offense and then treated less harshly than the
plaintiff.  *See Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir.
1999); *Hanna v. Herman*, 121 F. Supp. 2d 113, 120-21 (D.D.C.
2000).  In this case, as neither Mr. Apt nor Mr. Nolan "failed to
complete assignments, refused to follow instructions, or made
statements that caused severe anxiety and disruption in the
workplace[,]"  Def.'s Reply Br. at 9, neither individual can
serve as a similarly-situated comparator.

discrimination: that the employer's asserted reason for terminating him was pretextual.

### b. Plaintiff's Evidence of Pretext

Plaintiff attempts to offer several reasons that defendant's asserted nondiscriminatory reason for his removal is unworthy of credence. Plaintiff begins by arguing that "[t]he facts and circumstances surrounding the October 17, 2002 meeting demonstrate that Defendant's explanation for Plaintiff's termination is not credible." Pl.'s Opp'n Br. at 11. In support of this assertion, plaintiff argues that the October 17th Meeting was not really a mid-year review, rather it was an "investigative meeting" where "Defendant intended to take some form of disciplinary action [on plaintiff]." Pl.'s Opp'n Br. at 11-13. Next, plaintiff argues that "[d]efendant's actions after the [October 17th] meeting are also suspect and could give a jury reason to doubt Defendant's motives and action." Pl.'s Opp'n Br. at 13. Towards this end, plaintiff argues that Mr. Hauser's termination decision was rendered in violation of the agency manual, explaining that Mr. Hauser (i) did not interview plaintiff about the October 17th Meeting; (ii) imposed a penalty of removal rather than progressive discipline; and (iii) ignored plaintiff's harassment complaint against Scott. Pl.'s Opp'n Br. at 18. Third, plaintiff argues that the Court can infer pretext due to the lack of objective evidence of "anxiety and disruption"

at PBSD following the October 17th Meeting.  Pl.'s Opp'n Br. at 19.  The Court will explore these arguments in turn.

First, plaintiff's characterization of the October 17th Meeting as an investigatory meeting rather than a mid-year evaluation lacks evidentiary support.  *See, e.g.*, Hopkins Decl. ¶ 1 ("On Thursday, October 17, 2002, I attended a mid-year review for Paul Adair with Risa Sandler, Leslie Perlman and Bill Scott. I had told Paul earlier that day that the supervisors in our office wanted to do a review with him."); Perlman Decl. ¶¶ 3,4 (providing an overview of the performance review process at PBSD and explaining that "[o]n October 17, 2002, Risa Sandler, Liz Hopkins, William Scott and I met with Mr. Paul Adair to conduct his midyear review").[13]  Indeed, plaintiff himself concedes that

_____

[13]    Plaintiff's argument appears to be based on an email that Mr. Scott sent Mr. Hauser on September 30, 2002 – two weeks before the October 17th Meeting.  *See* Pl.'s Opp'n Br. at 11 (discussing Mr. Scott's email dated September 30, 2002).  In this email, Mr. Scott stated: "Since there was no mid-term meeting with [plaintiff], I am submitting my comments this way. [Plaintiff] did very little substantial work since February. . . ."  AR Tab 13, Ex. W, p. 1, Email from Scott to Hauser dated Sept. 30, 2002.  While this email is evidence that a mid-year review had not occurred as of September 30, 2002, it does not allow a reasonable jury to infer that a mid-year review was not subsequently held.  To the contrary, the evidence in the administrative record demonstrates that such a meeting occurred on October 17, 2002.  *See, e.g.*, Hopkins Decl. at 1; Perlman Decl. ¶¶ 3,4; *see also* AR Tab 4cc4, Ex. C. to 2002 Scott Decl., Email from Scott to Rouse dated October 18, 2002 ("On October 17, 2002, from about 11 am to about 12 pm, we conducted a mid-year performance appraisal of Trial Attorney Paul Adair. . . . The purpose of the meeting was for Mr. Adair's supervisors to discuss his performance in the past six months with him and to suggest improvements he might make between now and the end of the

his cases were reviewed at the meeting. *See* Pl.'s Opp'n Br. at 13 (arguing that defendant improperly combined a "planned interrogation with an actual review of other cases"). Second, and more importantly, plaintiff fails to explain how the October 17th Meeting gives rise to an inference of pretext.[14]

The Court also finds that plaintiff's complaints regarding Mr. Hauser fail to establish pretext. While plaintiff complains that Mr. Hauser did not contact him until 30 hours after the October 17th Meeting and argues that "neither Hauser nor any other agency representative interviewed Plaintiff between when he was suspended on October 18, 2002 and when he was terminated on March 26, 2003[,]" Pl.'s Opp'n Br. at 13-14, the record evidence demonstrates that Mr. Hauser made "repeated requests" to meet with plaintiff prior to rendering the Agency Decision. Agency Decision at 7; *see supra* n.9. In addition, although plaintiff

---

performance period.").

[14]     Rather than demonstrating pretext, the purpose of this argument appears to be aimed at having the Court disregard the statements that plaintiff made at the meeting. *See* Pl.'s Opp'n Br. at 11-13 (explaining that if he knew that defendant was planning to "accuse[] [him] of refusing to do certain tasks," he would have sought to have a union representative attend the meeting; concluding that "[u]nder these unique circumstances and in light of the interests at stake, Defendant should be precluded from using the illegal meeting as a basis for her adverse action"). For the reasons discussed *infra* the Court finds that this argument lacks merit. *See* Section III.B.5 (concluding that the agency did not deprive plaintiff of his right to union representation because plaintiff did not request the presence of a union representative at any point before or during the October 17th Meeting).

complains that Mr. Hauser "deviated from the agency's policy of progressive discipline" and imposed a penalty that "exceeds the bounds of reasonableness and proportionality," Pl.'s Opp'n Br. at 16-17, plaintiff fails to provide any evidence in support of this assertion. For example, plaintiff does not identify a similarly-situated employee of a different race upon whom the agency imposed a lesser penalty. Defendant, by contrast, submits the declaration of Mr. Hauser who explains: "The Department does not have a table of penalties and Mr. Adair's termination is not inconsistent with any agency rules or policies for dealing with misconduct. I know of no conduct by any member of PBSD's staff that is comparable to Mr. Adair's statements at the October 17 meeting or to his flat refusal to continue work on Employers Mutual. . . In my experience, Mr. Adair's conduct at the October 17 meeting and its impact were unprecedented at PBSD." AR [Docket Entry 7-8 at 22], Declaration of Timothy D. Hauser ("Hauser Decl.") ¶ 9. Finally, plaintiff argues that Mr. Hauser "completely ignored Plaintiff's harassment complaint against Scott." Pl.'s Opp'n Br. at 18. Despite this bold assertion, plaintiff has failed to provide the Court with any evidence supporting the existence of such a harassment complaint, other than his own self-serving declaration. As the agency contends

that no such claim was filed, *see* Agency Decision at 6,[15] the
Court finds that plaintiff has failed to present a genuine issue
of material fact regarding the existence of this complaint.  *See*
*Fields,* 520 F. Supp. 2d at 105 (finding that the plaintiff had
failed to create a genuine issue of material fact that defendant
"made derogatory statements about black employees" where
plaintiff "offer[ed] no evidence to support these charges except
her own testimony"); *see also Holcomb*, 433 F.3d at 899 (finding
that summary judgment was properly granted where, although
plaintiff "recite[d] a litany of allegations purporting to show
unlawful animus on the part of [defendants]," the allegations
were either "conclusory" or "without evidentiary support").

   Lastly, plaintiff argues that the Court can infer pretext
due to the lack of objective evidence of "anxiety and disruption"
following the October 17th Meeting.  Pl.'s Opp'n Br. at 19-24.
The Court finds this argument unavailing.  Despite plaintiff's

---

[15]    In the Agency Decision, Mr. Hauser acknowledged
plaintiff's "frequent demands to be taken off the [Employers
Mutual] case and [his] flippant statement to me that [he]
need[ed] to get a restraining order against Mr. Scott."  Agency
Decision at 6.  Mr. Hauser further explained: "Although you now
portray your statement as an expression of alarm about physical
intimidation, in fact you made the comment in the context of
complaining about Mr. Scott's repeated requests and efforts to
get you to do your work.  You were not expressing concern about
your safety, but rather making a flamboyant statement of your
right to be free from supervision on the Employers Mutual case.
Mr. Scott has never threatened you physically, and you did not
make any such complaint when you sought to be removed from the
case."  Agency Decision at 6.

assertion that his supervisors' actions "after the October meeting show that they uniformly acted in ways that belie the charge that Plaintiff caused anxiety and disruption in the office," Pl.'s Opp'n Br. at 20, the administrative record in this case demonstrates that his supervisors were clearly disturbed by the events that occurred at the October 17th Meeting. *See* Sandler Decl. ¶¶ 12-14; Perlman Decl. ¶ 11; Hopkins Decl. ¶ 4; 2002 Scott Decl. ¶¶ 21-22; *see also* Hauser Decl. ¶ 4 ("Shortly after the October 17 meeting, I spoke separately with each of the supervisors, listened to their descriptions of the meeting and observed their reactions. . . . Based on my observations, the supervisors were genuinely and profoundly disturbed by Mr. Adair's words and demeanor, his use of violent imagery, and his unsolicited statement that he had harbored violent feelings towards Mr. Scott. Immediately after the meeting, one of the supervisors, Risa Sandler, specifically requested that Mr. Adair be banned from the building, expressing concern for her own safety and the safety of others . . . . Even after Mr. Adair had been banned from the building, the supervisors continued to be upset and express their apprehension about the events on October 17."). While plaintiff submitted the declarations of two co-workers, Diane Clinton and Delores Durham, in support of his assertion that "[n]either Durham nor Clinton discerned any evidence of anxiety or disruption in the office," Pl.'s Opp'n Br.

at 21, the Court finds that these declarations fail to create a
genuine issue of material fact.  First, neither Ms. Durham nor
Ms. Clinton attended that portion of the October 17th Meeting
where plaintiff made the statements that led to his supervisors'
anxiety and disruption.[16]  Second, neither of the declarants
directly addressed whether there was any "anxiety or disruption
in the office" following the October 17th Meeting.  *See* AR, Tab
31, Supp. Index of Exhibits, Exs. KK, MM.[17]

In sum, having closely reviewed the parties' arguments as
well as the administrative record in this case, the Court finds
that plaintiff has failed to put forth competent evidence that
would allow a reasonable jury to conclude that he was terminated

---

[16]     Ms. Durham and Ms. Clinton were briefly summoned by
plaintiff to serve as "witnesses" during the October 17th
Meeting.  *See* AR Tab 31, Supp. Index of Exhibits, Ex. MM,
Declaration of Delores E. Durham ("Durham Decl.") ¶¶ 7-10 ("On
October 17, 2002, when Mr. Paul Adair was having his mid-year
review, he asked me and another co-worker, Diane Clinton, to come
into that meeting.  I was asked to acknowledge whether I recalled
seeing a handwritten notation written by Mr. Bill Scott ('once
again') on a document that Mr. Paul Adair had prepared.  I
indicated that I recalled seeing the notation on the document and
stated that Mr. Scott's requested changes were minor.  Shortly
after acknowledging the notation on the document, I left the
room."); AR Tab 31, Supp. Index of Exhibits, Ex. KK, Declaration
of Diane Clinton ("Clinton Decl.") ¶ 5 ("Paul Adair asked Delores
Durham and I if we recalled him showing each of us a document
with the words, 'once again' handwritten on it.  I told him that
I did. . . Delores Durham also answered in the affirmative. . . .
Paul Adair thanked us and apologized for having to involve us,
and Delores Durham and I both left the Conference Room.").

[17]     Ms. Durham did, however, aver that "[s]ince
[plaintiff's] departure, I have not noticed any significant
changes in the office."  Durham Decl. ¶ 15.

on account of his race.  To the contrary, there is substantial evidence in the record that plaintiff was terminated for, among other reasons, causing anxiety and disruption in the workplace as a result of his comments to his supervisors during the October 17th Meeting.  Accordingly, the Court hereby **GRANTS** defendant's motion for summary judgment as to plaintiff's race discrimination claim.  *See, e.g.*, *Evans*, 618 F. Supp. 2d at 14 (granting summary judgment where there was "substantial evidence in the record that Plaintiff performed poorly, compromised FBI security, and was insubordinate"); *see generally Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.").

### 2. Disability Discrimination

#### i. Legal Framework

To bring a claim for disability discrimination under the Rehabilitation Act a plaintiff must demonstrate that he is disabled within the meaning of the Act.  *See Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008).[18]  A person is disabled under the

---

[18]    Significant changes to the American with Disabilities Act ("ADA") and Rehabilitation Act took effect on January 1, 2009, after the events in this action took place.  *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008).  Because the D.C. Circuit has held that "the Amendments do not apply retroactively," *Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 938 (D.C. Cir. 2009), this Court will apply the

Rehabilitation Act if he "has a physical or mental impairment which substantially limits one or more of [his] major life activities; has a record of such an impairment; or is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). As discussed below, because plaintiff has proffered no evidence to demonstrate that he is disabled within the meaning of the Act, the Court finds that plaintiff cannot bring a disability claim.[19]

### ii. Analysis

Defendant argues that "[p]laintiff's claims of clinical depression do not rise to the level of limitation of a major life activity and are unsubstantiated by the record." Def.'s Mot. for

_____

pre-amendment law to determine whether plaintiff is an "individual with a disability." *Id.* at 942.

[19]    As a general matter, claims under the Rehabilitation Act are governed by the *McDonnell Douglas* burden-shifting framework. *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000). Therefore, when - as here - the defendant has proffered a legitimate, non-discriminatory explanation for the plaintiff's termination, the Court generally applies *Brady*'s simplification of the *McDonnell Douglas* framework. *Franklin*, 600 F. Supp. 2d at 74; *see also Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 n.2 (D.C. Cir. 2009)(finding that the district court correctly applied *Brady*'s summary judgment analysis to a Rehabilitation Act claim). "But the question whether [plaintiff] is disabled is a predicate to bringing a claim of discrimination." *Ellis v. Georgetown Univ. Hosp.*, No. 08-1174, 2010 U.S. Dist. LEXIS 69028, at *10 n.4 (D.D.C. July 12, 2010) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 488-89, 494 (1999)); *see also Mitchell v. Yates*, 402 F. Supp. 2d 222, 228 (D.D.C. 2005) ("[P]laintiff's complaint must adequately allege facts sufficient to support the claim that he has a 'disability' within the meaning of the ADA, or else be subject to dismissal."). Accordingly, the Court must grant defendant's motion for summary judgment if Mr. Adair is not disabled. *See Ellis*, 2010 U.S. Dist. LEXIS 69028, at *10 n.4.

Summ. J. at 18.  This Court agrees.  When plaintiff was asked by
defendant to provide medical evidence of his purported
disability, plaintiff provided only a prescription note from a
doctor indicating that plaintiff was seen and a treatment plan
was provided.  AR [Docket Entry 7-15 at 8].  After plaintiff was
notified by defendant that the prescription was "inadequate to
justify extended sick leave because it does not state that you
will be unable to come to work because of medical treatment nor
does it state that you are incapable of performing the duties of
your job," Handorf Letter, plaintiff provided no additional
medical documentation.  Handorf Decl. ¶ 3.  While plaintiff now
avers that during 2001-2002 he "was having difficulty seeing and
reading" as well as "difficulty caring for his person and
[working]," Pl.'s Opp'n Br. at 25-26, plaintiff's self-serving
statements are "simply too vague and conclusory" for a reasonable
jury to conclude that he was substantially limited in a major
life activity.  *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 199
(D.D.C. 2008); *see, e.g.*, *Alexander v. Tomlinson*, 507 F. Supp. 2d
2, 21-22 (D.D.C. 2007) (finding plaintiff's affidavit which
described difficulties "eating, sleeping, and concentrating," but
provided "no detail whatsoever regarding the nature or extent of
these difficulties," as "plainly insufficient" to survive the
defendant's motion for summary judgment); *Thompson v. Rice*, 422
F. Supp. 2d 158, 174 (D.D.C. 2006) (plaintiff's assertion that

37

she was substantially limited in caring for herself and performing certain tasks, such as basic household tasks, driving long distances, and getting up in the morning, was insufficient to survive summary judgment where plaintiff "provided little evidence to substantiate this claim, or otherwise describe the degree to which she is limited with any reasonable specificity"). Accordingly, the Court hereby **GRANTS** defendant's motion for summary judgment as to plaintiff's disability discrimination claim.

### B. Non-Discrimination Claims

Because the Court has disposed of plaintiff's discrimination claims, *see supra* Section III.A, the Court must now review the non-discrimination components of plaintiff's mixed case before the MSPB. In a so-called "mixed case" — that is, one in which "an adverse personnel action subject to appeal to the MSPB [is] coupled with a claim that the action was motivated by discrimination," *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999) (citations omitted) — the Court conducts a de novo review of the plaintiff's discrimination claims but must review the non-discrimination claims exclusively on the administrative record. 5 U.S.C. § 7703(c).

"The non-discrimination findings of the MSPB Administrative Judge are reversible only if they were arbitrary or capricious, obtained without lawful procedures, or were

unsupported by substantial evidence." *Willingham v. Gonzales*, 391 F. Supp. 2d 52, 63 (D.D.C. 2005) (citing 5 U.S.C. § 7703(c)); *see also Fogg v. Ashcroft*, 254 F.3d 103, 112 (D.C. Cir. 2001) ("[W]e review the MSPB's assessment deferentially, upsetting it only if it was arbitrary and capricious or an abuse of discretion, or if it was unsupported by substantial evidence."). "To show that the MSPB's decision is not arbitrary and capricious, defendant needs only to show that the decision has a rational basis in the law." *Hanna*, 121 F. Supp. 2d at 117 (internal citations omitted). "[I]n assessing whether the MSPB's ruling was supported by substantial evidence, a court is limited to determining 'whether the agency . . . could fairly and reasonably find the facts that it did,' and 'an agency conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.'" *Willingham*, 391 F. Supp. 2d at 63-64 (quoting *Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994)). Ultimately, "[t]he role of the courts in this area of federal employment relations is strictly limited, and the MSPB's decision cannot be overturned if it is supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hanna*, 121 F. Supp. 2d at 121 (internal citations and quotation marks omitted).

Plaintiff argues that the MSPB Decision must be reversed for several reasons. Specifically, plaintiff contends that: (i) "[t]he MSPB's findings that the tasks [contained in Reason 2, Specification 1 of the Agency Decision] were valid and outstanding as to Adair after July 29, 2002 must be set aside as clearly erroneous," Pl.'s Mot. for Partial Summ. J. at 2; (ii) the MSPB's finding that the failure to follow instructions charge and the insubordination charge were two separate charges was clearly erroneous, Pl.'s Mot. for Partial Summ. J. at 29; (iii) "[d]efendant's stated reasons for terminating Plaintiff's employment are unsupported by substantial evidence," Compl. ¶ 96; (iv) "[d]efendant's first charge fails because it accused Plaintiff of making threatening comments, but neither the deciding official nor the MSPB analyzed the charge under threat analysis as required by law," Compl. ¶ 98; (v) "[p]laintiff's termination was achieved without procedures required by law, rule, or regulation having been followed," Compl. ¶ 99; (vi) "[d]efendant and the MSPB acted arbitrarily and capriciously and abused their discretion in denying Plaintiff relevant discovery, witnesses, and other evidence necessary to exercise his constitutional and statutory rights to defend against the charges," Compl. ¶ 100; (vii) "[d]efendant and the MSPB acted arbitrarily and capriciously and abused their discretion in denying Plaintiff information relevant and necessary to examine

and, if possible, prove his discrimination claims," Compl. ¶ 101; (viii) "[d]efendant and the MSPB acted arbitrarily and capriciously and abused their discretion in denying Plaintiff the legal basis for requiring him to waive all of his privacy rights over his medical records and submit to a medical examination," Compl. ¶ 102; (ix) "[t]he penalty of termination was grossly excessive, not in accordance with Agency standards, procedures, or history, and was imposed without consideration of all relevant factors," Compl. ¶ 103; and (x) "[p]laintiff's termination did not promote the efficiency of the service," Compl. ¶ 93. Defendant, by contrast, argues that the MSPB Decision upholding plaintiff's removal was not arbitrary, capricious, or otherwise in derogation of the law and therefore should be upheld. The Court will explore these arguments in turn.

### 1. Reassignment of Tasks

A large portion of plaintiff's motion for partial summary judgment and supplemental motion for partial summary judgment are spent addressing his contention that the MSPB Decision is "clearly erroneous" because the assignments given to him by Mr. Scott on July 17, 2002 were – "[u]nbeknownst" to plaintiff – "reassigned" to two of his colleagues, Mr. Apt and Mr. Dolan, on July 29, 2002. Pl.'s Mot. for Partial Summ. J. at 24. It is plaintiff's position that "[t]he reassignment of July 29 ended [his] responsibility," Pl.'s Mot. for Partial Summ. J. at 20, and

that "[t]he MSPB's findings that the tasks were valid and outstanding as to [him] after July 29, 2002 must be set aside as clearly erroneous." Pl.'s Mot. for Partial Summ. J. at 2; *see, e.g.*, Pl.'s Mot. for Partial Summ. J. at 20 ("This then is not a case of Adair refusing to work, but rather a case of Defendant taking work from Adair. The reassignment of July 29 ended Adair's responsibility."); Pl.'s Supp. Mot. for Partial Summ. J. at 3-4 ("There is no genuine dispute that Scott reassigned the work on July 29. . . . The Notice claims Plaintiff did not follow instructions and was insubordinate for failing to obey deadlines between August 1 and October 17, 2002, which cannot be true by virtue of Scott's email."); Pl.'s Mot. for Partial Summ. J. at 2 ("To use a football analogy, Defendant claimed Adair fumbled, but the July 29 email was a change of possession. Adair cannot be charged with a fumble when he did not have possession. The MSPB's findings that the tasks were valid and outstanding as to Adair after July 29, 2002 must be set aside as clearly erroneous."). The Court finds this argument baseless.

There is no evidence to indicate that plaintiff was in any way absolved of his responsibility to complete the assignments given to him on July 17, 2002, simply because Mr. Scott reached out to additional attorneys to work on the same assignments. Indeed, to the contrary, evidence in the administrative record indicates that defendant repeatedly affirmed to plaintiff after

July 29, 2002 that he was still responsible for the assignments contained in the July 17th Email.  *See, e.g.*, AR Tab 4cc2, Email from Scott to Adair dated Aug. 7, 2002 ("[P]lease do items 1, 2, and 4 of the July 17 assignment (attached below) by August 19."); AR Tab 4cc3, Email from Perlman to Adair dated Aug. 9, 2002 ("I am sending you the following assignment for the EM case even though you told me yesterday that you would not do the assignments and would accept your punishment . . . I urge you to reconsider your position.  You must complete the assignments below on the schedule [Mr. Scott] proposed which has a deadline of August 19.").[20]  The Court therefore declines to set aside the MSPB's finding that Mr. Adair's tasks were valid and outstanding after July 29, 2002.

### 2.  Merger of Tasks

Plaintiff also argues that the MSPB Decision upholding the agency's determination that plaintiff both failed to follow instructions and acted insubordinately was legally erroneous. Plaintiff asserts that the failure to follow instructions charge and the insubordination charge "aris[e] out of the same nucleus

---

[20]    *See also* AR Tab 7-10 at 22, Email from Scott to Adair dated July 30, 2002 ("Paul: As I have informed you several times before, you have not been taken off the Employers Mutual case. Your declared belief to the contrary has no basis in reality. Peter and Ben were brought in to help when you stopped working on the case and things had to be done in the case.  You cannot unilaterally take yourself off a case, and no one has informed you that you were removed. . . . I ask that you please do the work I assigned to you and let us move on.").

of facts," and must therefore be "merged into one [charge]."
Pl.'s Mot. for Partial Summ. J. at 29.  It is plaintiff's
position that "[d]efendant created a second offense by merely
repeating an order it claimed was not initially obeyed, which it
cannot legally do."  Pl.'s Supp. Mot. for Partial Summ. J. at 7.
The Court disagrees.

Despite plaintiff's protestations to the contrary, *see* Pl.'s
Mot. for Partial Summ. J. at 27, 29, this is not a case in which
defendant is seeking to discipline plaintiff "multiple times for
the same claimed infraction."  Pl.'s Mot. for Partial Summ. J. at
4; *cf. Southers v. Veterans Admin.*, 813 F.2d 1223 (Fed. Cir.
1987) (finding that the agency committed legal error in charging
the plaintiff with 19 charges of false testimony, when the
charges were based on a single interview in which "the agency
asked a total of 19 questions relating to whether [the plaintiff]
had attended the 9 a.m. class").  As evidenced by both the Agency
Decision and the MSPB Decision, defendant's insubordination
charge is based on plaintiff's purported statements that he
refused to continue working on the Employers Mutual case at the
October 17th Meeting and during a meeting with his supervisor on
August 8, 2002, while the failure to follow instructions charge
is based on plaintiff's failure to complete certain tasks in the
Employers Mutual case - i.e., his failure to revise a contempt
motion in Spring 2002 and his failure to complete the specific

44

tasks contained in the July 17th Email prior to the October 17th Meeting. *See also* Def.'s Response to Pl.'s Supp. SMF ¶ 35 ("[T]he charge of insubordination is not based upon Plaintiff's actual failure to perform work assignments, but rather, the charge of insubordination is predicated on Plaintiff's refusal to perform the work assignments referenced in Scott's July 17, 2002 and August 7, 2002 emails when directed to do so by both Scott and Perlman."). Given the different facts and evidence that underlie the two charges, the Court finds that the MSPB's determination that the agency established both a failure to follow instructions charge and an insubordination charge is not legally erroneous. *See also, e.g.*, *Pedeleose v. Dep't of Def.*, 343 Fed. Appx. 605 (Fed. Cir. 2009) (finding substantial evidence to support the agency's charges of insubordination and failure to follow instructions).

### 3.  Substantial Evidence

More generally, plaintiff argues that defendant's stated reasons for terminating his employment are unsupported by substantial evidence. *See* Compl. ¶¶ 96, 97. As noted above, in assessing whether the MSPB's ruling was supported by substantial evidence, the Court is limited to determining "whether the agency . . . could fairly and reasonably find the facts that it did[.]" *Willingham*, 391 F. Supp. 2d at 63 (internal quotation marks omitted). Moreover, "an agency conclusion may be supported by

substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Id.* Having carefully reviewed the Agency Decision and the 48-page MSPB Decision, the Court finds plaintiff's argument unavailing. The MSPB considered a great deal of evidence - carefully analyzing each party's declarations and exhibits – in reaching its conclusions on each charge. Indeed, the MSPB, in reaching its decision, discarded a specification that it found to be procedurally defective. *See* MSPB Decision at 26-27 (concluding that specification 4 of charge 2 was "procedurally defective and may not be sustained"). While plaintiff may be displeased with how the MSPB weighed the evidence, he does not identify any pertinent evidence that the MSPB wholly failed to consider nor does he otherwise meet his burden to show that the agency could not fairly and reasonably find the facts that it did. Accordingly, the Court concludes that the MSPB's affirmance of the three charges was supported by substantial evidence.

### 4. Threat Analysis

Plaintiff also contends that "[d]efendant's first charge fails because it accused Plaintiff of making threatening comments, but neither the deciding official nor the MSPB analyzed the charge under threat analysis as required by law." Compl. ¶ 98. The Court disagrees. A review of the Notice of Proposed Removal indicates that plaintiff is charged with "[m]aking

46

statements to supervisors and co-workers that resulted in anxiety and disruption in the workplace," not making threatening comments.  Notice of Proposed Removal at 1.  Indeed, in rejecting this argument, the MSPB persuasively explained:

> [Plaintiff] argued that the agency failed to establish the factors utilized by the Board in evaluating an alleged threatening comment. . . . In this case, however, the appellant was not charged with making a threat.  Rather, he was charged with making statements that resulted in anxiety and disruption in the office.  Although witnesses presented sworn or affirmed testimony that they perceived the appellant's comments to be threatening against Mr. Scott or other agency employees, the agency did not charge the appellant with making a threat.

See MSPB Decision at 15 (internal citations omitted).  Because plaintiff was not charged with making threatening comments, the Court finds that the MSPB did not err in declining to analyze whether plaintiff satisfied the 5-part test set forth in *Metz v. Department of the Treasury*, 780 F.2d 1001 (Fed. Cir. 1986), as those factors need only be considered "in deciding whether an employee threatened his supervisors or co-workers."  *Id.* at 1002; *see also, e.g.*, *McCarty v. Dep't of the Navy*, 67 M.S.P.R. 177, 182-83 (1995) (finding that the administrative judge did not err in failing to consider whether the appellant intended to make a threatening statement under *Metz* because "so long as the agency proves its charge of making statements that caused anxiety and disruption in the workplace, and further proves that discipline

promotes the efficiency of the service and that the penalty of removal is reasonable, its charge may be sustained").

### 5. Termination Achieved Without Procedures Required by Law

In his complaint, plaintiff also asserts that "[his] termination was achieved without procedures required by law, rule, or regulation having been followed." Compl. ¶ 99. "To prove harmful procedural error, the [plaintiff] must prove that the agency committed an error in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error." MSPB Decision at 34 (citing 5 C.F.R. § 1201.56(c)(3)). "The burden is upon the [plaintiff] to show that the agency committed an error and that the error was harmful, *i.e.*, that it caused substantial prejudice to his rights." MSPB Decision at 34. Although plaintiff's complaint fails to set forth specific procedural errors, in his motions for partial summary judgment plaintiff alleges the following: (i) "[d]efendant's denial of Plaintiff's right to union representation was a harmful procedural error," Pl.'s Supp. Mot. for Partial Summ. J. at 8; (ii) "the presence of Scott at the meeting was an intentional provocation inasmuch as Adair had recently made a formal complaint against him for harassment," Pl.'s Mot. for Partial Summ. J. at 5; and (iii) "[d]efendant also violated due process by allowing Hauser, who had shown a bias, to

remain as the deciding official," Pl.'s Mot. for Partial Summ. J. at 33. For the reasons discussed below, the Court finds that plaintiff has failed to establish that any of these purported "errors" constitute a harmful procedural error.

First, the Court finds that plaintiff has failed to establish that the agency committed any "error" with regards to plaintiff's alleged denial of his right to have a union representative at the October 17th Meeting. It is undisputed that plaintiff did not request a union representative at any point during the October 17th Meeting. The agency, therefore, cannot be found to have denied plaintiff his right to have a union representative present when none was requested. *Cf. Nat'l Labor Relations Bd. v. Weingarten, Inc.*, 420 U.S. 251, 256-57 (1975) (discussing how the Board's recognition that "§ 7 [of the National Labor Relations Act] creates a statutory right in an employee to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline," but explaining that the Board "shaped the contours and limits of this statutory right" by finding that the right arises "only in situations where the employee requests representation"; "In other words, the employee may forgo his guaranteed right and, if he prefers, participate in an interview unaccompanied by his union representative.").

Second, the Court finds no evidence in the record to support plaintiff's assertion that Mr. Scott's attendance at the October 17th Meeting was intended as "an intentional provocation" in response to plaintiff's purported "formal complaint against him for harassment[.]" Pl.'s Mot. for Partial Summ. J. at 5. Instead, as explained in the declaration of plaintiff's former supervisor, Leslie Perlman, "[w]hen [the agency] conduct[s] midyear and end of year performance reviews, it is [the agency's] practice to have each counsel present, as well as each Senior Trial Attorney present who has worked with an attorney to give input." Perlman Decl. ¶ 3. As Mr. Scott had supervised plaintiff's work during the rating period, it was consistent with agency policy for Mr. Scott to attend the October 17th Meeting, Perlman Decl. ¶ 2; plaintiff has produced no evidence to the contrary. Nor has plaintiff adduced any evidence - other than his own self-serving declaration – to support the existence of a harassment claim against Mr. Scott. The agency, as discussed above, vigorously disputes that any such complaint was ever filed. *See supra* n.15. Moreover, even assuming that the agency committed error in allowing Mr. Scott to attend the October 17th Meeting, plaintiff has failed to demonstrate how his attendance substantially prejudiced plaintiff's procedural rights. This assertion of harmful error must therefore also fail.

Finally, plaintiff asserts that defendant erred "by allowing Hauser, who had shown a bias, to remain as the deciding official." Pl.'s Mot. for Partial Summ. J. at 33. While it is "violative of due process to allow an individual's basic rights to be determined by . . . a biased decisionmaker," *Svejda v. Dep't of Interior*, 7 M.S.P.R. 108, 111 (1981) (citing *Withrow v. Lawkins*, 421 U.S. 35, 58 (1975)), "there is no general proscription of the appointment as a deciding official of a person who is familiar with the facts of the case and has expressed a predisposition contrary to the appellant's interests." *Id.; see also* MSPB Decision at 40-41 (rejecting plaintiff's assertion that Mr. Hauser was improperly named as the deciding official because "appellant has cited no authority for his assertion that a deciding official must be completely removed from the appellant's situation"). In this case, after carefully reviewing plaintiff's litany of complaints regarding Mr. Hauser, *see, e.g.*, Pl.'s Opp'n Br. at 38-40, the Court finds no evidence in the administrative record to support plaintiff's assertions of bias, other than his own self-serving declarations.[21] Moreover,

_____

[21] For instance, in support of his claim that Mr. Hauser was a "biased" decisionmaker, plaintiff asserts that "[i]t was also Hauser's personal decision not to take any action on Adair's harassment complaint, *calling the idea of a white harassing a black* 'flamboyant.'" Pl.'s Mot. for Partial Summ. J. at 7-8 (citing AR, Tab 4a, Decision Regarding Proposed Removal, p. 6) (emphasis added); *see also* Pl.'s SMF ¶ 43 ("Hauser now describes the report of a white employee harassing a black employee 'flamboyant.'"). A review of the page cited by plaintiff in the

"the evidence of record establishes that the deciding official properly considered the relevant factors in determining that the appellant's removal was warranted by the evidence and supported by the efficiency of the service." MSPB Decision at 41. Accordingly, the Court finds that the MSPB did not err in upholding the selection of Mr. Hauser as deciding official in this case, and finds no violation of plaintiff's right to due process in that respect.

### 6. MSPB's Decisions Regarding Discovery, Witnesses, and Other Evidence

Plaintiff also alleges that the MSPB acted arbitrarily and capriciously and abused its discretion in denying him "relevant discovery, witnesses, and other evidence necessary to exercise his constitutional and statutory rights to defend against the charges[.]" Compl. ¶ 100. In his motions, plaintiff primarily focuses on the ALJ's denial of his request to compel the

---

administrative record, however, reveals the following statement by Mr. Hauser: "Other examples [that you overreact too easily] include your frequent demands to be taken off the [Employers Mutual] case and your flippant statement to me that you needed to get a restraining order against Mr. Scott. Although you now portray your statement as an expression of alarm about physical intimidation, in fact you made the comment in the context of complaining about Mr. Scott's repeated requests and efforts to get you to do your work. *You were not expressing concern about your safety, but rather making a flamboyant statement of your right to be free from supervision on the Employers Mutual case.* Mr. Scott has never threatened you physically, and you did not make any such complaint when you sought to be removed from the case." Agency Decision at 6 (emphasis added). The Court has found plaintiff's motions to be replete with such misrepresentations of the record. *See, e.g.*, supra n.2.

appearance of Elizabeth Hopkins – one of plaintiff's former supervisors who attended the October 17th Meeting – at the administrative hearing. *See, e.g.*, Pl.'s Supp. Mot. for Partial Summ. J. at 10-11. As a threshold matter, it is undisputed that the ALJ declined to compel the appearance of Ms. Hopkins because Ms. Hopkins was on vacation. *See* Pl.'s SMF ¶ 50. It is also undisputed that neither Ms. Hopkins nor any other witness testified at the administrative hearing because plaintiff withdrew his request for an administrative hearing after the ALJ issued her prehearing rulings. *See* AR Tab 26, Notice and Close of Record Order ("On June 20, 2003, the appellant notified this office in writing that he would not be participating in the hearing scheduled in this appeal for June 24, 2003. As grounds for his assertion, the appellant stated that he disagreed with witness rulings and the order of presentation regarding his affirmative defenses. . . . As the hearing in this matter was scheduled at the appellant's request, his decision not to participate in the hearing effectively withdraws his hearing request."). Although plaintiff argues that the MSPB "committed a harmful error and abused its discretion in refusing to compel [Ms. Hopkins'] testimony," the Court finds that plaintiff waived his right to appeal the ALJ's prehearing rulings by withdrawing his request for an administrative ruling.

Even assuming, however, that plaintiff did not waive his right to appeal the ALJ's prehearing rulings, the Court is not persuaded that the MSPB abused its discretion in failing to compel Ms. Hopkins, who was on vacation, to attend the administrative hearing. *See Ayres v. Dep't of Homeland Sec.*, 280 Fed. Appx. 991, 995 (Fed. Cir. 2008) (explaining that discovery and evidentiary rulings "fall within the discretion of the Board and its officials, and will not be overturned absent a clear and harmful abuse of discretion"). While plaintiff proffers that he wanted to question Ms. Hopkins regarding certain statements in her declaration, *see generally* Hopkins Decl., as well as her "comments to Scott during the [October 17th] meeting that he was angry and should calm down," Pl.'s Supp. Mot. for Partial Summ. J. at 10-11, the Court finds that plaintiff has failed to demonstrate how his inability to elicit testimony on those issues imposed substantial harm or prejudice. *See Johnson v. SSA*, 276 Fed. Appx. 1014, 1018 (Fed. Cir. 2008) ("[Appellant's] conclusory allegations in his brief detailing various allegedly improper decisions of the AJ regarding the scope of discovery fall far short of demonstrating an abuse of discretion."); *Williams v. McCausland*, No. 90-7563, 1995 U.S. Dist. LEXIS 13341, at *56-67 (S.D.N.Y. Sept. 15, 1995) (rejecting the claim that the ALJ abused her discretion by refusing to compel certain responses requested by the plaintiff and allowing the plaintiff to subpoena

adverse witnesses where the plaintiff "fail[ed] to identify any information that he was unable to obtain that would have affected the outcome of the proceedings").

In sum, upon close review of the administrative record in this case, the Court finds nothing to suggest that the ALJ abused her discretion with regards to discovery.

### 7. Information Relevant to Discrimination Claims

Plaintiff further alleges that "[d]efendant and the MSPB acted arbitrarily and capriciously and abused their discretion in denying Plaintiff information relevant and necessary to examine and, if possible, prove his discrimination claims." Compl. ¶ 101. This argument appears to be aimed at defendant's failure to disclose the fact that Mr. Scott asked two other trial attorneys, Mr. Apt and Mr. Dolan, to work on the assignments contained in the July 17th Email. *See* Pl.'s Mot. for Partial Summ. J. at 31-32 ("Defendant had an affirmative duty to disclose evidence that [plaintiff]'s work had been reassigned because [the ALJ] had to consider the evidence in determining whether [plaintiff] had failed to follow instructions or was insubordinate with respect to those assignments."). For the reasons discussed above, *see supra* Section III.B.1, the Court finds that disclosure of this information would not have affected the outcome of the administrative proceedings. The Court, therefore, declines plaintiff's request to reverse the MSPB

Decision based on defendant's purported failure to timely disclose this evidence.

### 8. Medical Records and Medical Examination

Plaintiff further asserts that "[d]efendant and the MSPB acted arbitrarily and capriciously and abused their discretion in denying Plaintiff the legal basis for requiring him to waive all of his privacy rights over his medical records and submit to a medical examination." Compl. ¶ 101. This contention lacks merit. The MSPB properly recognized that:

> [T]he appellant was not removed for failing to consent to a medical examination nor did the agency require such an examination. Rather, the agency simply offered the examination in response to the appellant's claim of a mental condition affecting his ability to perform his duties. The appellant had been previously advised of his right to submit medical documentation in conjunction with his leave requests. He failed to do so. . . . The appellant exercised his right to decline the examination. In rendering its final decision to remove the appellant, the agency did not penalize the appellant for his denial of the examination but did note that, absent the examination or other medical documentation from the appellant, the appellant failed to establish a mitigating factor based on a mental or physical condition.

MSPB Decision at 38-39. As the administrative record contains no evidence that the agency required plaintiff to "waive all of his privacy rights over his medical records and submit to a medical examination," Compl. ¶ 101, the Court finds that the MSPB properly rejected plaintiff's claim of harmful error on this issue.

### 9.   Reasonableness of the Penalty

Plaintiff also challenges the agency's decision to terminate him, arguing that "[t]he penalty of termination was grossly excessive, not in accordance with Agency standards, procedures, or history, and was imposed without consideration of all relevant factors."  Compl. ¶ 103.  The Court finds this argument unpersuasive.  The Court "must defer to the agency's determination of disciplinary action unless the penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion."  *Allen v. United States Postal Serv.*, 466 F.3d 1065, 1071 (Fed. Cir. 2006).  Here, that is not the case.  The agency considered the relevant *Douglas* factors, *see Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 305-06 (1981), and provided a thorough explanation of why the penalty of removal was appropriate.  *See* Agency Decision at 6-7.  The agency also expressly considered plaintiff's "eight years of service" and "past highly effective performance ratings" in determining the proper penalty to be imposed.  Agency Decision at 6. Nevertheless, despite plaintiff's past highly effective performance, the agency found, among other things, that: "[Plaintiff's] express refusal to work on Employers Mutual, coupled with [plaintiff's] alarming statements, would effectively make it difficult for any PBSD attorney to supervise [him], not just on Employers Mutual, but on any case in which disagreements

might arise. PBSD cannot effectively discharge its responsibilities if employees refuse to follow the directions of their supervisors, and supervisors cannot do their jobs if they have to worry about the potential for unwarranted, provocative, and possibly dangerous responses when they issue proper directions to an employee." Agency Decision at 6. After finding that "the deciding official, Timothy Hauser, fully considered the *Douglas* factors," the MSPB upheld the agency's penalty explaining that "[t]he charges in this case are serious and clearly affected the agency's ability to accomplish its mission." MSPB Decision at 43-44. This Court agrees. Given the substantial evidence supporting the agency's charges in this case – and in particular, evidence of the anxiety and disruption that resulted from the October 17th Meeting – the MSPB's determination that the punishment was reasonable will not be disturbed.

### 10. Efficiency of the Service

Plaintiff also argues that his termination did not promote the efficiency of the service. Compl. ¶ 93. He argues that he "was an honored, respected, and productive employee . . . [whose] annual performance standards and ratings over the course of his Agency career never fell below the second highest rating of highly efficient." Compl. ¶ 93. Defendant, in response, argues that "[d]efendant's removal of [plaintiff] based on the three

(3) independent charges of misconduct promotes the efficiency of the service." Def.'s Reply Br. at 17.

An agency may take an adverse action against an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). "As the case law has developed, courts have framed the 'efficiency of the service' issue in terms of requiring a 'nexus' between . . . 'the articulated grounds for an adverse personnel action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate governmental interest promoting the 'efficiency of the service.'" *Hanna*, 121 F. Supp. 2d at 124 (quoting *Yacovone v. Bolger*, 645 F.2d 1028, 1031 (D.C. Cir. 1981)). This requirement has been translated into a three-part test in which the agency must prove by a preponderance of the evidence that (1) the charged conduct occurred; (2) there is a nexus between the conduct and the efficiency of the service; and (3) the penalty imposed is reasonable. *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1147 (Fed. Cir. 1997). The Court finds that the agency satisfied this test.

First, there is substantial evidence to support the MSPB's finding that the charged conduct occurred in this case. Indeed, with regards to the anxiety and disruption charge, plaintiff does not deny having made the statements in the October 17th Meeting that underlie that charge. The Court also finds that the

insubordination charge and failure to follow instructions charge
are supported by substantial evidence, as defendant submitted
sworn declarations of agency officials in support of those
charges as well as corroborating documentary evidence.  Moreover,
given the serious nature of the charges involved and its negative
impact on PBSD as reflected in the sworn affidavits of
plaintiff's former supervisors, the MSPB properly found that
there was a sufficient nexus between that misconduct and the
efficiency of the service.  *See* Agency Decision at 6 (explaining
how defendant's conduct impeded PBSD's ability to "effectively
discharge its responsibilities").  Finally, as discussed above,
*see supra* Section III.B.9, the ALJ's finding that removal was a
reasonable punishment is supported by substantial evidence.  The
Court, therefore, finds that the agency had ample justification
for its finding that the efficiency of the agency would be
improved by removing plaintiff from federal service.

### 11.  Due Process Violations

In addition to the purported errors discussed above,
plaintiff also asserts a claim for "violations of due process."
*See* Compl. ¶¶ 85-90.  In his complaint, plaintiff asserts three
purported due process violations: (i) defendant's failure to
produce certain discoverable information, Compl. ¶ 87;
(ii) defendant's failure to produce certain witnesses at the MSPB
hearing, Compl. ¶ 88; and (iii) the vagueness of Specification

One of the Insubordination Claim in the Agency's Proposal of
Removal, Compl. ¶ 89.  As a threshold matter, the Court notes
that "the Fifth Amendment 'only requires that a person receive
his 'due' process, not every procedural device that he may claim
or desire.'"  *Kropat v. FAA*, 162 F.3d 129, 132 (D.C. Cir. 1988)
(quoting *Johnson v. United States*, 628 F.2d 187, 194 (D.C. Cir.
1980)); *see also Chang v. D.C. Dep't of Regulatory & Consumer
Affairs*, 604 F. Supp. 2d 57, 64 n.4 (D.D.C. 2009) ("If an
individual receives adequate notice and the opportunity to be
heard in a meaningful manner, [his] procedural due process rights
have not been violated, even though [he] believes the decision
that results from that opportunity to be heard to be incorrect."
(citing *American Towers, Inc. v. Williams*, 146 F. Supp. 2d 27, 33
(D.D.C. 2001))).  For the reasons discussed above, *see supra*
Sections III.B.1, III.B.6, the Court finds that defendant's
purported failure to produce certain discoverable information as
well as defendant's failure to produce certain witnesses at an
administrative hearing that plaintiff withdrew from does not
amount to a due process violation as plaintiff has failed to
demonstrate how these alleged deficiencies substantially
prejudiced his right to be heard in a meaningful manner.  To the
contrary, this Court finds that plaintiff received a more than
adequate opportunity to present his case and engage in discovery.
*See* Def.'s Mot. for Summ. J. at 22-23 ("As noted throughout AJ

Armstrong's lengthy decision, Adair clearly set forth arguments, attempted to rebut arguments and evidence by Defendant, and his arguments received a thorough analysis by an impartial adjudicator.").

The Court also rejects plaintiff's claim that Specification One of the Insubordination Charge in the Notice of Proposed Removal was impermissibly vague. This specification states:

> During the October 17, 2002 mid-year performance review meeting, I explicitly told you that you had not been taken off the Employers Mutual case. I told you that all of us are required to work on cases or assignments that we would rather not do, but that was part of our responsibility to the people whose interests we represent. You said that you were not going to work on the case. You said that we had already had that conversation in August 2002 when I told you that I was sending you an email telling you to do certain assignments for the case. You said that you had told me then, that you would not work on the case and you continue to refuse to work on the case.

Notice of Proposed Removal at 5. While plaintiff may not agree with the substance of the charge, the Court is not persuaded that the specification failed to provide plaintiff with sufficient notice of the facts underlying the specification. The Court, therefore, upholds the MSPB's determination that this specification was "sufficiently specific to put the appellant on notice of the underlying facts so that he could fully respond to the agency's charges." MSPB Decision at 40.

In sum, the Court concludes that the MSPB Decision is clearly supported by the law, is not arbitrary or capricious, and

was not obtained in violation of plaintiff's procedural rights. Indeed, the Court finds that the administrative record in this case provides ample support for the MSPB's finding that the agency sustained the three charges of misconduct by a preponderance of the evidence, and – given the serious nature of the charges and their impact on the agency – that plaintiff's removal was appropriate. Accordingly, the decision of the MSPB is **AFFIRMED**, defendant's request for summary judgment as to plaintiff's non-discrimination claims are **GRANTED**, and plaintiff's request for partial summary judgment on these claims is **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motions for partial summary judgment. An appropriate Order accompanies this Memorandum Opinion.

**Signed:**    **Emmet G. Sullivan**
              **United States District Judge**
              **September 30, 2010**

Notice to:
Paul C. Adair
1325 13th Street, NW
Apartment 52
Washington, DC 20005